

FILED

MP

1/11/2021

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. **1:21-CR-00019** |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Violations: Title 15, United States |
| | ) | Code, Sections 77q(a), 77x, 78j(b), |
| | ) | 78ff, and 17 C.F.R. Section |
| DAVID FOLEY and | ) | 240.10b-5; and Title 18, |
| BENNIE BLANKENSHIP | ) | United States Code, Section 1343 |

JUDGE SEEGER
MAGISTRATE JUDGE FINNEGAN

The SPECIAL NOVEMBER 2020 GRAND JURY charges:

1.     At times material to this Indictment:

a.     Defendant DAVID FOLEY, a resident of California, was an officer and director of Nanotech Entertainment, Inc. ("NTEK"), a Nevada corporation with its principal place of business in San Jose, California. NTEK was engaged in the business of, among other things, providing a subscription video streaming platform for viewing movies.

b.     NanoTech Gaming, Inc. ("NTGL") was a Nevada corporation with its principal place of business in Las Vegas, Nevada. NTGL was engaged in the business of developing game technology. Prior to its incorporation as NTGL, NTGL had operated as a division of NTEK.

    c.    Defendant BENNIE BLANKENSHIP, a resident of Ohio, operated an entity called Big Investment Group LLC, which he used to promote the stock of NTGL and other stocks.

    d.    Company A was a Nevada corporation with its principal place of business in New York. Company A was engaged in the business of ceramics manufacturing, and it was operated by Individual 1 In or about June 2014, Company A became Company 2.

    e.    In or about February 2015, NTEK purchased a controlling share of Company 2 from Co-Schemer 1, in the form of preferred stock of Company 2. At or around that same time, NTEK entered into an asset purchase agreement with Company 2, whereby NTEK sold certain of its assets, consisting mostly of office equipment and intellectual property, to Company 2, in return for shares of Company 2's common stock.

    f.    In or about March 2015, Company 2 changed its name to NTGL.

    g.    In or about June 2015, DAVID FOLEY reported to Taft Correctional Institution, in California, to serve a term of imprisonment for conduct unrelated to the scheme that is charged in this Indictment. DAVID FOLEY was imprisoned at Taft until about December 2016.

    h.    Galaxy Entertainment Group, Inc. ("Galaxy") was a South Dakota Corporation formed in about June 2015. Individual 2, a close relative

of DAVID FOLEY, was listed in various Galaxy documents as its Chief Executive Officer.

      i.     Individual 3 was a close family member of DAVID FOLEY. Individual 3 was made an officer and director of NTGL and NTEK.

      j.     Co-Schemer 2 was a resident of Texas.  Co-Schemer 2 was the founder and President of Company 3, an entity that purported to be in engaged in bridge refinancing, debt recapitalization, and stock block purchases.

      j.     Company 4, was an Illinois corporation based in Chicago that purported its activities as including, among other things, providing financing to penny stock companies.

      k.     Co-Schemer 3 was a resident of Chicago, Illinois and of Puerto Rico, and Co-Schemer 3 was the President of Company 4.  Co-Schemer 3 also was the President of Company 5, another company that was based in Chicago and Puerto Rico.

      l.     The United States Securities and Exchange Commission ("SEC") was an independent agency of the United States government charged with protecting investors by regulating and monitoring, among other things, the purchase and sale of publicly traded securities, including securities such as shares of NTGL stock.  Federal securities laws prohibited fraud in connection with the issuance, purchase and sale of securities, including the

sales of restricted shares of stock and the manipulation of the price and trading volume of stock sales through misleading promotion of the shares and coordinating buying and selling of stock shares.

m.     NTGL's shares were quoted on OTC Link, which was operated by OTC Markets, an inter-dealer electronic and trading system. OTC securities were not listed on major stock exchanges and tended to be securities of companies that were small, had stock that was owned by a smaller number of individuals, and were thinly traded.

n.     The SEC promulgated rules regarding the sale of restricted shares of stock.   Under 17 C.F.R. § 230.144 ("Rule 144"), restrictions were placed on the sale of shares of stock that were not registered.  Restricted shares of stock could not be sold by a person or entity unless the person or entity was considered to have held those shares for at least a certain period of time since having acquired those shares from the issuer or from an affiliate of the issuer.

o.     Shares of stock were sold through transfer agents.  When restricted shares of stock were sold to a person or entity, the transfer agent would issue a stock certificate that contained a legend noting that the shares were restricted.  If, however, the transfer agent were provided with an opinion letter issued by an attorney that the shares being sold were not restricted, pursuant to Rule 144, then the transfer agent would issue a stock certificate without the restricted legend, thereby indicating the shares were freely

tradable. Brokers and dealers of securities also often required such an opinion letter from an attorney that shares were unrestricted and freely tradable before permitting the resale of those shares.

   p. Broker Dealer A was a registered broker dealer that offered, among other services, the deposit and clearing of OTC shares.

   q. Transfer Agent A was a registered transfer agent that issued stock certificates.

   r. Attorney A was an attorney practicing law in Oregon.

  2. Beginning no earlier than in or about March 2013, and continuing until no earlier than in or about October 2016, in the Northern District of Illinois, Eastern Division, and elsewhere,

DAVID FOLEY and
BENNIE BLANKENSHIP,

defendants herein, and their co-schemers, devised, intended to devise, and participated in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, which scheme is further described below.

  3. It was part of the scheme that:

5

a. Defendant DAVID FOLEY caused shares of NTGL to be issued to Galaxy without a restrictive legend, which permitted them to be freely traded, when those shares should have been restricted for at least one year following their issuance. In particular, their issuance without a restrictive legend enabled Galaxy to quickly resell those NTGL shares to Company 4 pursuant to stock purchase agreements, and enabled Company 4 to quickly resell those shares to the investing public. By causing the NTGL shares that Galaxy converted to be unrestricted, DAVID FOLEY thereby ensured having—in Company 4—a buyer for the NTGL shares and the resulting source of funds for NTGL, Galaxy and defendants.

b. Defendants DAVID FOLEY and BENNIE BLAKENSHIP caused the coordinated and manipulated purchases and sales of NTGL shares on OTC Link in a way that was designed to and did artificially inflate the prices of NTGL shares (a "pump and dump" scheme), causing the investing public to be defrauded.

The Fraudulent Issue and Sale of NTGL Shares as Unrestricted

4. It was further part of the scheme that in or about March 2013, Co-Schemer 1 caused the creation of a fraudulent Independent Contractor Agreement between Company 1 and Individual 4. That Independent

Contractor Agreement purported to enlist the services of Individual 4 to assist Company 1, in return for $50,000, when Co-Schemer 1 knew that Individual 4 would not be called upon to perform any services for Company 1 and that Individual 4 would not be paid for such purported services. During the course of the scheme, defendant DAVID FOLEY learned the Independent Contractor Agreement was fraudulent.

5.     It was further part of the scheme that on or about September 2, 2014, after Company 1 had changed its name to Company 2, Co-Schemer 1 caused the creation of a fraudulent and forged promissory note issued by Company 2 to Individual 4. That promissory note purported to serve as Company 2's promise to pay Individual 4 the money it supposedly owed Individual 4 under the Independent Contractor Agreement. On or about September 3, 2014, Co-Schemer 1 caused the creation of a fraudulent and forged amendment to the promissory note that purported to provide to Individual 4 the right to convert the debt he supposedly was owed by Company 2 into shares of Company 2 at his option. These two documents together constituted a convertible promissory note. During the course of the scheme, defendant DAVID FOLEY learned that the promissory note and amendment to the promissory note (the convertible promissory note) were fraudulent.

6. It was further part of the scheme that on or about January 28, 2015, Co-Schemer 1 and defendant DAVID FOLEY caused the creation of a fraudulent and forged Purchase and Full Assignment of a Promissory Note between Individual 4 and DAVID FOLEY, in which Individual 4 purportedly assigned to DAVID FOLEY the promissory note and the amendment to the promissory note (the convertible promissory note), in return for a $5,000 payment to Individual 4. These documents had the effect of assigning to DAVID FOLEY the right to convert the remainder of Company 2's supposed debt to Individual 4 into shares of Company 2. DAVID FOLEY knew the assignment of the convertible promissory note was based on the fraudulent premise that Company 2 legitimately owed a debt to Individual 4.

7. It was further part of the scheme that on or about February 13, 2015, defendant DAVID FOLEY converted $550 of the purported Company 2 debt into 1.1 million Company 2 shares and entered into a stock purchase agreement with Company 4 to sell to Company 4 those 1.1 million shares. DAVID FOLEY caused an attorney to issue a Rule 144 opinion letter in which the attorney wrote that DAVID FOLEY was not an affiliate of Company 2 and the Company 2 shares being issued to DAVID FOLEY were unrestricted and freely tradable, when DAVID FOLEY knew that he was an affiliate of

Company 2 and he was not permitted to sell those shares to Company 4 at that time.

8.    It was further part of the scheme that defendant DAVID FOLEY caused Individual 3 and others to appear to control and operate NTGL—including during the period of time after DAVID FOLEY's conviction for a criminal offense and while he served his sentence at Taft—when in reality DAVID FOLEY controlled all aspects of NTGL's operations, to the extent it had any, through Individual 3 and others.  These operations were primarily limited to submitting filings to OTC and issuing NTGL shares to others. DAVID FOLEY masked his control of NTGL through Individual 3 and others so as not to appear to be an affiliate of NTGL.

9.    It was further part of the scheme that defendant DAVID FOLEY caused Galaxy to be established as an entity that he used to acquire NTGL shares and then to sell them to Company 4. DAVID FOLEY controlled and operated Galaxy through Individual 2 in order to mask his control of Galaxy, so as not to appear to be an affiliate of Galaxy, and so Galaxy did not appear to be an affiliate of NTGL, when he knew he controlled and was an affiliate of Galaxy and that Galaxy was an affiliate of NTGL.

10.    It was further part of the scheme that defendant DAVID FOLEY caused NTGL to file documents with OTC that listed other individuals as

officers and directors of NTGL—but not himself—and stated that NTGL had no other controlling persons, when he knew he himself controlled NTGL. DAVID FOLEY caused these false documents to be filed publicly in order to mask his control of NTGL so as not to be considered an affiliate of NTGL. He also caused these documents further to state that none of the persons listed as operating and controlling NTGL had been convicted in a criminal proceeding within the preceding five years, when he knew he had been convicted in two criminal cases within the preceding five years, because he did not want his criminal history to be associated with NTGL.

11. It was further part of the scheme that in December 2015, defendant DAVID FOLEY caused the creation of documents that served to assign the convertible promissory note from DAVID FOLEY to Galaxy, including an assignment of the note and Board of Directors approval of the assignment. DAVID FOLEY caused the assignment of the convertible promissory note in order to enable Galaxy to convert the debt into NTGL shares and further mask his involvement in the conversion and issuance of the NTGL shares to Galaxy.

12. It was further part of the scheme that in December 2015, defendant DAVID FOLEY caused Galaxy to convert $9,000 of supposed NTGL

debt into 18 million shares of NTGL stock so that Galaxy could have those shares to quickly sell as unrestricted and freely tradable shares.

13. It was further part of the scheme that defendant DAVID FOLEY caused Individual 3 and Individual 2 to issue and supply to an attorney letters on behalf of NTGL and Galaxy, respectively, claiming that certain conditions were met so as to make the NTGL shares to be issued to Galaxy unrestricted and freely tradable, when DAVID FOLEY knew the claims made in these letters contained false information. DAVID FOLEY caused these letters to be issued and supplied to the attorney in order to persuade the attorney to issue a Rule 144 opinion letter saying the NTGL shares should be unrestricted, freely tradable, and issued without the restrictive legend, when he knew those shares should be restricted and not freely tradable.

14. It was further part of the scheme that defendant DAVID FOLEY, through Individual 3 and Individual 2's submission of the false letters, caused an attorney to issue and submit to Broker Dealer A and Transfer Agent A Rule 144 opinion letters stating that the 18 million NTGL shares being issued to Galaxy should be unrestricted and freely tradable, when he knew they should have been restricted.

15. It was further part of the scheme that in January 2016, defendant DAVID FOLEY caused Galaxy to enter into stock purchase agreements with

Company 4, whereby Galaxy agreed to and then did sell the 18 million shares of NTGL stock to Company 4, when DAVID FOLEY knew Galaxy could not sell those shares to Company 4 as unrestricted and freely tradable shares, because he knew they should have been restricted shares. He also knew that Company 4 could not then, in turn, sell them to the investing public, even though he knew Company 4 would so sell them. In fact, Company 4 and Company 5 sold those shares through at least about October 2016.

### Fraudulent Manipulation of NTGL's Stock Price (the "Pump and Dump")

16. It was further part of the scheme that defendant DAVID FOLEY, having made available to Galaxy a supply of millions of unrestricted NTGL shares through the submission of fraudulent Rule 144 opinion letters, sought to ensure a dependable buyer for those NTGL shares and resulting income for NTGL, Galaxy, and defendants. Rather than attempting simply to sell those NTGL shares on OTC Link, DAVID FOLEY negotiated with Co-Schemer 2 and Co-Schemer 3—and caused others to negotiate with them on his behalf—stock purchase agreements between Galaxy and Company 4. Under the stock purchase agreements DAVID FOLEY caused Galaxy to enter into with Company 4, Company 4 agreed to purchase NTGL shares from Galaxy at a discount of NTGL's prevailing market price. DAVID FOLEY knew that by agreeing to sell those shares from Galaxy to Company 4 at a discount of the

market price, Company 4 then could make a profit by quickly reselling those illegally unrestricted shares to the investing public and by capitalizing on the discount at which Company 4 had purchased those shares.

17.     It was further part of the scheme that defendants DAVID FOLEY and BENNIE BLANKENSHIP artificially manipulated the price of NTGL shares by engaging in and causing large-scale and coordinated purchases of NTGL shares on OTC Link, which they knew would cause the price of NTGL shares to rise and thereby generate a higher price for which Company 4 would pay Galaxy for those shares. DAVID FOLEY and BENNIE BLANKENSHIP knew that the increased price of NTGL's shares resulting from their coordinated buying of the stock was unconnected to NTGL's fundamental business performance and/or other legitimate market forces.

18.     It was further part of the scheme that defendants DAVID FOLEY and BENNIE BLANKENSHIP coordinated on the timing of their purchases of NTGL shares in order to take advantage of efforts to promote NTGL's stock and more effectively drive up the stock's price.

19.     It was further part of the scheme that defendant DAVID FOLEY caused others, including Individual 2, to attempt to promote NTGL to potential investors to help spark demand for NTGL stock in coordination with DAVID

FOLEY and BENNIE BLANKENSHIP's coordinated purchasing of NTGL shares.

20.    It was further part of the scheme that defendant BENNIE BLANKENSHIP caused other individual investors to purchase NTGL shares by promoting NTGL through exaggerated claims about NTGL and its stock's prospects for success. BENNIE BLANKENSHIP promoted NTGL and its stock to these individual investors in an effort further to increase the volume of purchases of NTGL's shares and thereby further raise the price of its shares.

21.    It was further part of the scheme that defendant BENNIE BLANKENSHIP apprised defendant DAVID FOLEY about the volume of NTGL stock purchases made by BLANKENSHIP himself and others whom he had convinced to purchase NTGL's shares, as well as the increased price of NTGL's stock resulting from those purchases.

22.    It was further part of the scheme that defendants DAVID FOLEY and BENNIE BLANKENSHIP sought Company 4's provision of advance payments on the purchase price of the NTGL shares it purchased from Galaxy, so DAVID FOLEY and BENNIE BLANKENSHIP could utilize those funds in their effort to manipulate the price of NTGL's stock.

23.    It was further part of the scheme that defendants DAVID FOLEY and BENNIE BLANKENSHIP agreed on a plan whereby DAVID FOLEY

14

would cause BENNIE BLANKENSHIP to be compensated for BLANKENSHIP's efforts to coordinate the purchasing of NTGL's shares in their effort artificially to manipulate the price of NTGL's stock.

24. It was further part of the scheme that defendants DAVID FOLEY and BENNIE BLANKENSHIP caused the price of NTGL's shares to be manipulated to artificially higher prices knowing that Company 4 would then sell those shares to the investing public, and knowing that Company 4's sales of those shares would cause the price of the shares to fall, resulting in losses to members of the investing public who had purchased those shares at the artificially inflated prices.

25. It was further part of the scheme that defendants DAVID FOLEY and BENNIE BLANKENSHIP misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the existence of the scheme, the purposes of the scheme, and acts done in furtherance of the scheme.

26. On or about January 21, 2016, in the Northern District of Illinois, Eastern Division, and elsewhere,

DAVID FOLEY and
BENNIE BLANKENSHIP,

defendants herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire communication in

15

interstate commerce, certain writings, signs, and signals, namely, an interstate wire transfer in the form of an ACH payment in the amount of approximately $87,755.85 from Company 4's account at JP Morgan Chase, to Galaxy's account at Wells Fargo Bank;

In violation of Title 18, United States Code, Section 1343.

## COUNT TWO

The SPECIAL NOVEMBER 2020 GRAND JURY further charges:

1.     The allegations in paragraphs 1-25 of Count One are incorporated here.

2.     On or about January 27, 2016, in the Northern District of Illinois, Eastern Division, and elsewhere,

DAVID FOLEY and
BENNIE BLANKENSHIP,

defendants herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate wire transfer in the form of an ACH payment in the amount of approximately $21,112.65 from Company 4's account at JP Morgan Chase, to Galaxy's account at Wells Fargo Bank;

In violation of Title 18, United States Code, Section 1343.

## COUNT THREE

The SPECIAL NOVEMBER 2020 GRAND JURY further charges:

1.     The allegations in paragraphs 1-25 of Count One are incorporated here.

2.     On or about February 2, 2016, in the Northern District of Illinois, Eastern Division, and elsewhere,

DAVID FOLEY and
BENNIE BLANKENSHIP,

defendants herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate wire transfer in the form of an ACH payment in the amount of approximately $8,424 from Company 4's account at JP Morgan Chase, to Galaxy's account at Wells Fargo Bank;

In violation of Title 18, United States Code, Section 1343.

## COUNT FOUR

The SPECIAL NOVEMBER 2020 GRAND JURY further charges:

1.     The allegations in paragraphs 1-25 of Count One are incorporated here.

2.     On or about February 4, 2016, in the Northern District of Illinois, Eastern Division, and elsewhere,

DAVID FOLEY and
BENNIE BLANKENSHIP,

defendants herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate wire transfer in the form of an ACH payment in the amount of approximately $65,000 from Company 4's account at JP Morgan Chase, to Galaxy's account at Wells Fargo Bank;

In violation of Title 18, United States Code, Section 1343.

## COUNT FIVE

The SPECIAL NOVEMBER 2020 GRAND JURY further charges:

1.      The allegations in paragraphs 1-25 of Count One are incorporated here.

2.      On or about January 21, 2016, in the Northern District of Illinois, Eastern Division, and elsewhere,

DAVID FOLEY,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an email from Attorney A to Broker Dealer A, with a copy to Co-Schemer 3, containing a Rule 144 opinion letter stating that Individual 4 had performed the services described in the Independent Contractor Agreement with Company 1;

In violation of Title 18, United States Code, Section 1343.

## COUNT SIX

The SPECIAL NOVEMBER 2020 GRAND JURY further charges:

1.    The allegations in paragraphs 1-25 of Count One are incorporated here.

2.    On or about January 27, 2016, in the Northern District of Illinois, Eastern Division, and elsewhere,

DAVID FOLEY and
BENNIE BLANKENSHIP,

defendants herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an email from BENNIE BLANKENSHIP to DAVID FOLEY discussing purchases of NTGL shares for which he was responsible;

In violation of Title 18, United States Code, Section 1343.

21

## COUNT SEVEN

The SPECIAL NOVEMBER 2020 GRAND JURY further charges:

1. The allegations in paragraphs 1-25 of Count One are incorporated here.

2. On or about February 23, 2016, in the Northern District of Illinois, Eastern Division, and elsewhere,

DAVID FOLEY and
BENNIE BLANKENSHIP,

defendants herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an email from BENNIE BLANKENSHIP to DAVID FOLEY informing him that he had been keeping NTGL's share price within a certain range pending more support;

In violation of Title 18, United States Code, Section 1343.

## COUNT EIGHT

The SPECIAL NOVEMBER 2020 GRAND JURY further charges:

1.     The allegations in paragraphs 1-25 of Count One are incorporated here.

2.     On or about March 21, 2016, in the Northern District of Illinois, Eastern Division, and elsewhere,

DAVID FOLEY and<br>
BENNIE BLANKENSHIP,

defendants herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an email from BENNIE BLANKENSHIP to DAVID FOLEY informing FOLEY that BLANKENSHIP had been keeping the price of NGTL within a certain range;

In violation of Title 18, United States Code, Section 1343.

## COUNT NINE

The NOVEMBER 2020 GRAND JURY further charges:

1.      The allegations in paragraphs 1 and 3-25 of Count One are incorporated here.

2.      Beginning no later than in or about March 2013, and continuing until no earlier than in or about October 2016, in the Northern District of Illinois, Eastern Division, and elsewhere,

### DAVID FOLEY and BENNIE BLANKENSHIP,

defendants herein, directly and indirectly, by the use of means and instrumentalities of interstate commerce, namely the internet and wire transmissions, willfully used and employed, in connection with the purchase and sale of securities, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme and artifice to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any person, in connection with the purchases and sales of shares of NTGL stock, as set forth more fully in paragraphs 3 through 25 of Count One;

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## COUNT TEN

The NOVEMBER 2020 GRAND JURY further charges:

1.     The allegations in paragraphs 1 and 3-25 are incorporated here.

2.     Beginning no later than in or about March 2013, and continuing until no earlier than in or about October 2016, in the Northern District of Illinois, Eastern Division, and elsewhere,

DAVID FOLEY and BENNIE BLANKENSHIP,

defendants herein, in the offer and sale of securities, directly and indirectly, by the use of means and instrumentalities of interstate commerce, namely the internet and wire transmissions, knowingly and willfully: (a) employed a device, scheme and artifice to defraud; (b) obtained money or property by means of untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any person, in connection with the offer and sale of shares of NTGL stock, as set forth more fully in paragraphs 3 through 25 of Count One;

In violation of Title 15, United States Code, Sections 77q(a) and 77x.


A TRUE BILL:


_____

FOREPERSON


_____

UNITED STATES ATTORNEY