UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

DAVID FOLEY

No. 21 CR 19-1

Judge Steven C. Seeger

**GOVERNMENT'S SUPPLEMENTAL RESPONSE TO
DEFENDANT'S POST-TRIAL MOTIONS**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

ARGUMENT .............................................................................................................. 2

I.    Legal Standards ................................................................................................ 2

    A.    Motion for Judgment of Acquittal ........................................................ 2

    B.    Motion for a New Trial ......................................................................... 4

II.    Analysis .......................................................................................................... 5

    A.    The Motion for Judgment of Acquittal (Rule 29) Should Be Denied...... 5

        1.    Fraudulently Unrestricting the Shares ....................................... 6

        2.    The Pump and Dump ................................................................ 19

    B.    The Motion for a New Trial Should Be Denied ..................................... 5

        1.    The Jury Instructions Were Correct ........................................ .23

        2.    Coconspirator Statement Were Properly Admitted ................. 25

        3.    Counts Nine and Ten Were Not Multiplicitous ....................... .30

        4.    The Jury's Verdict Was Not Irreconcilable and Was Not Against the Manifest Weight of The Evidence .................................. .32

# TABLE OF AUTHORITIES

## Cases

*Hernandez v. United States*, 2022 WL 1316587 (May 3, 2022) ...................... 24

*Jackson v. Virginia*, 443 U.S. 307 (1979) .................................................... 3

*Musch v. Domtar Industries, Inc.*, 587 F.3d 857 (7th Cir. 2009) ............................ 27

*Provident Savings Bank v. Popovich*, 71 F.3d 696 (7th Cir. 1995) ........................... 27

*Richardson v. United States*, 526 U.S. 813 (1999) ....................................... 24

*United States v. Arthur*, 582 F.3d 713 (7th Cir. 2009) ................................. 2

*United States v. Berg*, 640 F.3d 239 (7th Cir. 2011) ................................... 2

*United States v. Bourjaily*, 483 U.S. 171, 175-76 (1987) ................................ 25

*United States v. Boliaux*, 915 F.3d 493 (7th Cir. 2019) ................................. 24

*United States v. Boucher*, 796 F.2d 972 (7th Cir. 1986) ................................ 25

*United States v. Chilaca*, 909 F.3d 289 (9th Cir. 2018) ................................. 31

*United States v. Conley*, 875 F.3d 391 (7th Cir. 2017) ................................ 5

*United States v. Evans*, 486 F.3d 315 (7th Cir. 2007) ................................. 34

*United States v. Garcia*, 919 F.3d 489 (7th Cir. 2019) ................................. 4

*United States v. Gillaum*, 372 F.3d 848 (7th Cir. 2004) ............................... 4

*United States v. Gross*, 961 F.2d 1097 (3rd Cir. 2012) ................................. 32

*United States v. Haynie*, 179 F.3d 1048 (7th Cir. 1999) ................................ 26

*United States v. Hoover*, 246 F.3d 1054 (7th Cir. 2001) ................................ 25

*United States v. Jones*, 713 F.3d 336 (7th Cir. 2013) ................................. 2

*United States v. Klein*, 913 F.3d 73 (2nd Cir. 2019) ................................. 4

*United States v. Kuzniar*, 881 F.2d 466 (7th Cir. 1989) ................................ 5

ii

*United States v. Linwood*, 142 F.3d 418 (7th Cir. 1998) ............................................... 4

*United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996)...........................25

*United States v. McGee*, 408 F.3d 966 (7th Cir. 2005) ............................................. 34

*United States v. Miller*, 782 F.3d 793 (7th Cir. 2015) ............................................... 2

*United States v. Morales*, 902 F.2d 604 (7th Cir. 1990) ............................................. 4

*United States v. Orlando*, 819 F.3d 1016 (7th Cir. 2016)........................................... 2

*United States v. Parker*, 508 F.3d 434 (7th Cir. 2007) ............................................. 31

*United States v. Pisman*, 443 F.3d 912 (7th Cir. 2006)........................................... 34

*United States v. Platter*, 514 F.3d 782 (8th Cir. 2008) ........................................... 31

*United States v. Powell*, 469 U.S. 57 (1984)......................................................... 33, 34

*United States v. Presbitero*, 569 F.3d 691 (7th Cir. 2009)......................................... 3

*United States v. Rahman*, 805 F.3d 822 (7th Cir. 2015) ........................................... 3

*United States v. Ray*, 2020 WL 1472136 (N.D. Ind. 2020) ..................................... 31

*United States v. Rodriguez*, 975 F.2d 404 (7th Cir. 1992)....................................... 25

*United States v. Rollins*, 607 F.3d 500 (7th Cir. 2010)........................................... 27

*United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978)...........................25,28

*United States v. Santos*, 20 F.3d 280 (7th Cir. 1994) ............................................... 4

*United States v. Severson*, 569 F.3d 683 (7th Cir. 2009)........................................... 2

*United States v. Swan*, 486 F.3d 260 (7th Cir. 2007) ............................................... 4

*United States v. Thompson*, 944 F.2d 1331 (7th Cir. 1991) ..................................... 26

*United States v. Warren*, 593 F.3d 540 (7th Cir. 2010) ........................................ 2, 3

*United States v. Washington*, 184 F.3d 653 (7th Cir. 1999)...................................... 4

*United States v. Weiner*, 578 F.2d 757 (9th Cir. 1978)........................................... 24

iii

*United States v. Yeaman*, 194 F.3d 442 (3rd Cir. 1999)...............................................24

*United States v. York*, 59 F.3d 172 (6th Cir. 1995)...................................................31

*Unites States v. Griffin*, 684 F.3d 691 (7th Cir. 2012).................................................3

## Statutes

15 U.S.C. § 77q(a) .................................................................................2

15 U.S.C. § 78j(b) .................................................................................2

18 U.S.C. § 1343 ..................................................................................2

## Rules

Fed. R. Civ. P. 60(b) .............................................................................32

Fed. R. Crim. P. 29...............................................................................2

Fed. R. Crim. P. 33(a) ............................................................................7

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

DAVID FOLEY

No. 21 CR 19-1

Judge Steven C. Seeger

## GOVERNMENT'S RESPONSE TO
## DEFENDANT'S POST-TRIAL MOTIONS

The United States of America, by MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, hereby responds to defendant David Foley's post-trial motions for acquittal and a new trial.[1]  At trial, the government presented ample evidence from which a rational jury could convict defendant, and defendant raises no issues that warrant the grant of a new trial. Therefore, the Court should deny defendant's motions.

## INTRODUCTION

Defendant David Foley was charged with fraudulently issuing and selling shares of HVEL and NTGL and of manipulating the price of the NTGL shares as part of a "pump and dump" scheme. He was charged with eight counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 1-8) and two counts of securities fraud, in violation of 15 U.S.C. § 78j(b) and 78ff (Count 9) and 15 U.S.C. § 77q(a) and 77x (Count 10). After a jury trial, defendant was acquitted of the eight wire fraud counts

---

[1] While defendant's written post-trial motion (Dkt. No. 234) is a motion for a new trial, made pursuant to Rule 33, defendant is also standing on his previously made oral motion for judgment of acquittal, made pursuant to Rule 29. The government's response addresses both of defendant's motions.

and convicted of the two securities fraud counts. At the close of evidence, defendant made an oral motion for a judgment of acquittal, pursuant to Rule 29, and the government responded to his motion orally. The Court reserved ruling on his motion. In his written post-trial motions, defendant has preserved his oral Rule 29 motion and now filed in writing a motion for a new trial, pursuant to Rule 33. The government here responds to both motions.

## ARGUMENT

### I.  Legal Standards

#### A.  Motion for Judgment of Acquittal

A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a guilty verdict against a defendant.  Fed. R. Crim. P. 29.  The case law regarding motions made pursuant to Rule 29 is well settled. "In challenging the sufficiency of the evidence, [a defendant] bears a heavy, indeed, nearly insurmountable, burden." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010). S*ee also United States v. Orlando*, 819 F.3d 1016, 1021 (7th Cir. 2016) ("defendant faces an uphill battle in challenging the sufficiency of the evidence."); *United States v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015); *United States v. Jones*, 713 F.3d 336, 339-40 (7th Cir. 2013); *United States v. Berg*, 640 F.3d 239, 246 (7th Cir. 2011).

Under Rule 29, courts "do not reassess the weight of the evidence or second-guess the trier of fact's credibility determinations." *United States v. Arthur*, 582 F.3d 713, 717 (7th Cir. 2009); *see also United States v. Severson*, 569 F.3d 683, 688 (7th

Cir. 2009). This strict standard recognizes that "[s]orting the facts and inferences is a task for the jury." *Warren*, 593 F.3d at 547.

The reviewing court will view the "evidence in the light most favorable to the prosecution," and the defendant "must convince" the court that, even in that light, "no rational trier of fact could have found him guilty beyond a reasonable doubt." *Warren*, 593 F.3d at 546 (quotation omitted); *see also United States v. Rahman*, 805 F.3d 822, 836 (7th Cir. 2015). In other words, a court will "set aside a jury's guilty verdict only if 'the record contains no evidence, regardless of how it is weighed,' from which a jury could have returned a conviction." *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009) (quotation omitted).

A court's inquiry into the sufficiency of a verdict does not require it to ask whether the court itself would believe the evidence at trial was sufficient to establish guilt beyond a reasonable doubt, but rather whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). In doing so, a court facing a record of facts supporting conflicting inferences must presume that the trier of fact "resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*, at 326. In deciding whether a rational jury could have concluded that the government proved the essential elements of the offense, "[b]oth the evidence and all of the reasonable inferences that can be drawn from it are viewed in a light most favorable to the government." *Unites States v. Griffin*, 684 F.3d 691, 694-95 (7th Cir. 2012).

3

While the jury's inferences must be reasonable and not be based on either speculation or mere association, *see United States v. Garcia*, 919 F.3d 489, 501 (7th Cir. 2019), the court should not evaluate the evidence piecemeal or in isolation, but rather should view it as a whole and defer to the jury's choice of competing inferences to be drawn. *United States v. Klein*, 913 F.3d 73, 78-79 (2nd Cir. 2019).

### B.    Motion for a New Trial

Rule 33 provides that a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (quotation omitted). Courts may grant a new trial if the jury's verdict is "so contrary to the weight of the evidence that a new trial is required in the interest of justice." *See United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999). Put another way, "[t]he court should grant a motion for new trial only if the evidence preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007) (alteration in original) (internal quotations omitted). Thus, it is well-settled that motions seeking new trials are disfavored and should be granted sparingly and in "only the most extreme cases." *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (quotation omitted); *United States v. Gillaum*, 372 F.3d 848, 857-58 (7th Cir. 2004) (citation omitted) (courts should exercise "great caution" and be "wary of second guessing" the jury's verdict); *United States v. Morales*, 902 F.2d 604, 605 (7th Cir.

4

1990) ("A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly.").

Issues of witness credibility are to be decided by the jury, and questions about the credibility of a witness are not sufficient grounds for granting a new trial. *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). "Where a witness' testimony is such that reasonable [persons] could not have believed the testimony, however, then exceptional circumstances are present and the district court may take the testimony away from the jury." *Id.*, at 470-71. Overturning a jury's determination of a witness' credibility is usually reserved for extreme situations where, for example, it would have been physically impossible for the witness to have observed what he described or where it was impossible under the laws of nature for those events to have occurred. *See United States v. Conley*, 875 F.3d 391, 399-400 (7th Cir. 2017).

## II. Analysis

### A. The Motion for Judgment of Acquittal (Rule 29) Should Be Denied

At trial, the government presented abundant documentary and testimonial evidence proving that defendant engaged in a years' long fraudulent scheme to use lies and fake documents to make his shares of NTGL and HVEL unrestricted and then to manipulate the price of those shares through false statements and coordinated trading before selling the shares at artificially inflated prices. This evidence was sufficient for the jury to return a guilty verdict on all ten counts of the

indictment, and it was certainly sufficient for a rational jury to have found that the elements of the securities fraud counts were satisfied beyond a reasonable doubt.

### 1.    Fraudulently Unrestricting the Shares

The government established at trial that David Foley fraudulently caused HVEL and NTGL shares to be issued and transferred as unrestricted when he knew that that they should have been restricted. He accomplished this by making and causing to be made false representations about (1) the legitimacy of a purported consulting agreement between David Maidenbaum and Cetek Technologies (HVEL and NTGL's predecessor), (2) whether he and Galaxy Entertainment (a company created and put in his wife's name to sell NTGL shares) were affiliates of HVEL and/or NTGL, and (3) whether HVEL and NTGL were shell companies. David Foley fraudulently caused these shares to be made unrestricted because he knew that River North Equity would not purchase them unless they were freely trading shares. In other words, making them unrestricted was an essential part of the offer of those shares to River North, and his eventual sale of those shares to River North would not have happened absent his machinations to make them unrestricted.

Defendant's first step in fraudulently causing the shares to become unrestricted was to falsely represent to an attorney that the debt underlying his and then Galaxy's conversion of debt into stock shares was based on a legitimate consulting agreement between Cetek Technologies ("Cetek") and David Maidenbaum.

At trial, the evidence showed that the consulting agreement was a fraud, and that David Foley knew it.

At trial, David Maidenbaum testified that the consulting agreement that led to the shares of HVEL/NTGL stock was fraudulent. Specifically, Maidenbaum testified that Bruce Schoengood, his ex-brother-in-law, asked Maidenbaum if he wanted to make some quick money. Tr. 284-85. Schoengood told him that he could make $1,000 immediately and more money later if he allowed Schoengood to make him a consultant to Cetek. Tr. 284, 286-88. Maidenbaum testified that he had no expectation that he would do any work for Cetek, Tr. 285, and that he had no relevant experience or knowledge to even do the work described in the consulting agreement he signed, Tr. 287-88. The "consulting agreement," Gov. Exh. 1, provided that Cetek would pay Maidenbaum $50,000 for his services. Tr. 288. In return for signing the "consulting agreement," Bruce Schoengood gave him $1,000. Tr. 286. Maidenbaum testified that he did no consulting work. Tr. 288.

Bruce Schoengood testified that, prior to enlisting Maidenbaum, he and defendant had spoken on the phone about the possibility of defendant purchasing Cetek, a shell company with no assets or revenues. Tr. 202-04. Defendant told Schoengood that he was interested in Cetek only if it had "aged debt," Tr. 203-05, which was explained by the government's expert as debt that had existed for more than 6-12 months, Tr. 88, 96-100. *See also* Tr. 681. Because Cetek had no aged debt at the time, Schoengood devised a plan to create the fake consulting agreement

between Cetek and Maidenbaum to make it look as if Cetek had "aged debt" on its books. Tr. 205-09. Schoengood created the Independent Contractor Agreement, and backdated it to March 4, 2013, so the purported debt would be more than 12 months old. Tr. 208-12. Schoengood testified that he then told David Foley that he had "found" aged debt. Tr. 213-14. Schoengood knew that David Foley was aware from their prior conversations that Cetek had no aged debt; in other words, when Schoengood told defendant he had "found aged debt," he did so as a coded "wink and a nod" means of conveying that the debt was fraudulent. Tr. 213-14. Schoengood testified that he created this fraudulent aged debt because he knew defendant would not purchase Cetek unless it had aged debt. Tr. 204, 212-14.

Prior to finalizing the sale of Cetek to defendant, Schoengood purchased the company, and in 2014, changed its name to HVEL. Tr. 216; Gov. Exh. 89. Schoengood caused the fake $50,000 debt from Cetek to Maidenbaum to be memorialized in a Promissory Note, Gov. Exh. 2; Tr. 214-19, and then amended it into a convertible promissory note, Gov. Exh. 3; Tr. 219-220. On January 28, 2015, Bruce Schoengood arranged defendant's purchase of the convertible promissory note from David Maidenbaum for $5,000. Gov. Exh. 4; Tr. 221-24. On February 9, 2015, defendant sent $40,000 to Schoengood and $5,000 to Maidenbaum. Tr. 230, 290-95. At Schoengood's direction, Maidenbaum wrote a check to Schoengood's mother for $5,000, Gov. Exh. 405; Tr. 291, 295, demonstrating even further that the underlying debt between Cetek and Maidenbaum was a fraud.

8

The circumstances of defendant's purchase of the convertible promissory note corroborated Schoengood's testimony that defendant knew the "consulting agreement" was illegitimate. Specifically, defendant paid only $5,000 to Maidenbaum for the note, which supposedly secured a $50,000 debt. The evidence thus supports a clear inference that defendant had to know that he could not have purchased a legitimate $50,000 note from Maidenbaum for only $5,000, and that Maidenbaum was being paid the $5,000 just for signing his name to the agreement.

But the most damning piece of evidence that defendant knew the consulting agreement was a fraud is an email defendant wrote from prison to Jeff Foley, his brother, in which he responded to Jeff Foley's questioning what work Maidenbaum did to receive the $50,000 note. Defendant wrote that "madenbam [sic] didn't do work." Tr. 406-08; Gov. Exhs. 187, 188. A rational jury was well within its right to conclude that David Foley knew the purported debt that would later lead to the unrestricting of the shares was a fraud based on an entirely fabricated consulting agreement.

Purchasing the convertible promissory note gave defendant the means to convert the purported Maidenbaum debt into HVEL shares—and later allowed Galaxy to convert it into NTGL shares. On or about February 12, 2015, defendant entered into a stock purchase agreement with River North Equity in which Foley sold 1.1 million shares of HVEL to River North in return for $30,000. Tr. 827-30; Gov. Exh. 8. In that agreement, defendant falsely represented to River North that the 1.1

9

million HVEL shares were freely tradeable. Tr. 851-52. To provide further assurances to River North that the shares were freely tradeable, defendant also prepared and signed a Non-Affiliate Shareholder Representation Letter dated February 13, 2015, for Attorney Robert Laskowski, a securities lawyer. Tr. 707. In the letter, defendant wrote that he was not an affiliate of HVEL and that HVEL was not a shell company. Tr. 708; Gov. Exh. 9. Laskowski and River North employee Greg Share both testified that these statements, and the unrestricted nature of the shares, were material to whether River North would purchase the shares. Tr. 708-10; 953-57. But, as the evidence established, defendant knew those were lies. He knew the aged debt was fraudulent and that HVEL was a shell, and he knew that the shares were thus not freely trading. And he knew he was an affiliate.

Indeed, the testimony of Jeff and Phil Foley showed was that defendant controlled NTEK (and thereby controlled HVEL), even when he was in prison. Defendant made his brother NTEK's CEO in about 2012, as a result of his criminal legal troubles in California, Tr. 317-18; but both Jeff and Phil Foley testified that defendant still directed them, in excruciating detail, on how to run NTEK. *See, e.g.*, Tr. 319-21, 339-40, 398-402, 573. They testified that he drafted financial statements and press releases, made hiring and firing decision, and told them when and how to issue stock. *See, e.g.*, Tr. 320-21, 421-23, 573-75. As for defendant's argument that Al Stone was running NTEK, there was no evidence presented at trial to support the inference that Stone was managing the company. Stone, like Phil Foley, was just a

10

name that defendant placed on corporate documents to make them look legitimate. In fact, the evidence was the Mr. Stone was seriously ill, Tr. 336, and there was no evidence that Mr. Stone was involved in the company's decision-making during that time. The emails and phone calls at trial showed defendant directing the company—not Al Stone.

Defendant's control of NTEK gave him control over HVEL because NTEK controlled the overwhelming majority of HVEL (and later NTGL) shares. At trial, the government introduced a December 2, 2015 email, in which defendant explained to Aaron Hightower that he, David Foley, had acquired HVEL, writing that "when i bought hvel, i bought it lock stock and barrel. i bought the company, the preferred shares, and all the debt." Gov. Exh. 138. NTGL's December 31, 2015 Annual Information and Disclosure Statement described that on February 10, 2015, NTEK purchased from Bruce Schoengood a controlling interest in HVEL and sold certain assets to HVEL, which in March 2015 changed its name to NTGL. Gov. Exh. 89. That same document lists NTEK as owning 82.62% of NTGL's outstanding stock. Since David Foley controlled and was an affiliate of NTEK, he also controlled and was an affiliate of HVEL. He lied about his affiliate status to offer and then to sell his shares to River North.

As to whether defendant lied to Mr. Laskowski about HVEL not being a shell company, Bruce Schoengood testified that HVEL *was* a shell company. Tr. 203. Indeed, NTGL's Financial Statements (unaudited) for the year ending December 31,

11

2015—the year HVEL was restructured to become NTGL—showed that NTGL's only assets consisted of $57 in cash and claimed intellectual property worth a purported $739,836, but that it had over $353,000 in liabilities. Tr. 418-19; Gov. Exh. 90. The statements also showed that for 2015, NTGL had $0 in revenues, cost of sales, and gross profits, despite over $328,000 in expenses for items such as payroll, professional fees, sales and marketing, and rent. Tr. 420; Gov. Exh. 90. Jeff Foley, whom defendant appointed as NTGL's CEO and as a Director, testified that NTGL did virtually no business, and that his efforts were directed solely toward NTEK. Tr. 338. Indeed, defendant's December 2, 2015 email to Aaron Hightower went on to say that when he bought HVEL, it had no value other than the $125,000 he had paid for it, and that even in December 2015, when he wrote the email, it had no liquidity. Gov. Exh. 138. It was a shell company.

As a result of defendant's lies, on February 24, 2015, attorney Robert Laskowski emailed a Rule 144 opinion letter to Jersey Stock Transfer opining that defendant could sell the 1.1 million HVEL shares as freely tradeable pursuant to Rule 144. Gov. Exh. 9; Tr. 687-99. Laskowski testified that he based his opinion in part on what he believed was the legitimacy of the Independent Contractor Agreement between Cetek and Maidenbaum and on defendant's representations that he was not an affiliate of HVEL and that HVEL was not a "shell company." Tr. 678-79, 681-682, 690-95. Laskowski testified that he believed those representations were true based on the information he had been provided. Tr. 678-79, 681-682, 690-95, 700-710. Based

12

on this evidence, a reasonable jury could have concluded that those 1.1 million shares of HVEL were made freely tradeable because of the lies defendant told to Robert Laskowski, and that River North would not have purchased those shares unless defendant had lied to make them freely tradeable. The 1,100,000 shares of HVEL stock were deposited into River North's brokerage account and then sold on the public market. Gov. Exh. 408.

The evidence at trial proved that the HVEL share sale was just the first in a series of fraudulent stock sales defendant executed. In about June 2015, shortly before he reported to the Bureau of Prisons for two unrelated felony convictions, defendant caused the creation of Galaxy Entertainment ("Galaxy"), with his wife Lisa Foley listed as the CEO. Tr. 339, 341. As discussed below, the evidence showed that defendant controlled Galaxy through his wife.

On December 15, 2015, defendant sold to Galaxy the convertible promissory note he had obtained from Maidenbaum. Gov. Exh 10; Tr. 727-28. Because defendant controlled Galaxy, he essentially was selling the note to himself in the name of Galaxy. That same day, Galaxy converted $9,000 of the fake debt owed to Maidenbaum into 18,000,000 shares of NTGL stock. Gov. Exh. 10; Tr. 728-29. On that same day, defendant's brother, Jeff Foley, sent attorney Robert Laskowski documents in support of a request to have Mr. Laskowski issue a Rule 144 opinion letter stating that the 18 million shares of NTGL stock could be transferred from Galaxy to River North, pursuant to stock purchase agreements between the two entities, without a

restrictive legend—essentially, that the shares were free trading. Gov. Exh. 96; Tr. 716-39.

Among the documents provided to Mr. Laskowski were statements signed by Jeff Foley (on behalf of NTGL) and Lisa Foley (on behalf of Galaxy), collectively representing that Galaxy was not an affiliate of NTGL, that NTGL was not a shell company, and that Galaxy had acquired the NTGL shares more than one year earlier employing the tacking rules of Rule 144. Gov. Exh. 96.

The evidence at trial showed that Galaxy *was* an affiliate of NTGL. The evidence showed that defendant controlled Galaxy through his wife Lisa Foley, and that he also controlled NTGL (and NTEK) through Jeff Foley, Phil Foley, and others. The testimony of Jeff and Phil Foley was that David Foley made all key decisions for NTGL. *See, e.g.*, Tr. 340-41, 576, 590-91. Jeff Foley, NTGL's nominal CEO and Director, testified that he had no relevant experience to run NTGL, he was unaware that NTGL did any business, sold any products, or had any revenue. Tr. 314-15, 318, 338. He was unfamiliar with NTGL's public filing that had his name on it. Tr. 413-17. In his testimony, he was dismissive of NTGL as a legitimate business, saying it made no money so he focused on trying to save NTEK. Tr. 338, 340.

The testimony, as well as the emails and phone calls between defendant and others, showed that David Foley controlled NTGL, NTEK, and Galaxy. He made business decisions for both NTGL and NTEK (there was no evidence that Galaxy did any business at all), he wrote press releases, prepared financial statements for others

14

to file, directed payroll decisions, made hiring decisions, and negotiated contracts. *See, e.g.*, Tr. 340, 398-402, 422-31, 442-447, 579, 583, 590-91. After David Foley nominally stepped down as CEO of NTEK, he appointed Peter Riordan to replace him; but he then replaced Peter Riordan with Jeff Foley. Tr. 575-76. Later, he wrote to Lisa Foley that they had to replace Jeff Foley "as soon as we can." Gov. Exh. 345. He later brought in Russell St. John to effectuate his instructions. Tr. 1359-60. This evidence demonstrated that defendant controlled personnel decisions.

Dozens of emails introduced at trial showed that defendant controlled HVEL/NTGL and Galaxy. On February 12, 2016, defendant wrote to Phil Foley that he, David Foley, purchased HVEL from Bruce Schoengood. Tr. 594-95. According to NTGL's (previously HVEL) December 31, 2015 public filing, *NTEK* purchased the controlling interest of HVEL, Gov. Exh. 89; but in that moment of transparency, defendant acknowledged to Phil Foley that it was *he* who bought the controlling interest in HVEL (later named NTGL). Gov. Exh. 225. That admission is consistent with the testimony, emails, and calls showing that defendant controlled these companies.

As part of his dispute with River North, defendant emailed Lisa Foley the language to communicate to Ed Liceaga (the head of River North) and Michael Chavez (who brokered the stock purchase agreements) detailing the history of the deal between Galaxy and River North for 18 million shares of NTGL. Gov. Exh. 220. He gave her instructions on how much money to send to whom and from where,

15

including from Galaxy. Gov. Exh. 246. Indeed, he often had to explain to Lisa Foley, the nominal CEO of Galaxy, what Galaxy was and that funds in Galaxy accounts should be used in relation to NTGL. In another email, defendant emailed Russell St. John that he should tell Aaron Hightower that he (David Foley) and Lisa Foley brought St. John in to help manage Galaxy "and in turn ntgl." Gov. Exh. 268. The ability to bring in a new manager or executive, shows defendant's control over NTGL and Galaxy.

Additionally, defendant emailed Jeff Foley with the language to use for a NTGL shareholder letter, Tr. 446-447; Gov. Exh. 183, and he emailed Jeff Foley with detailed instructions on how to issue shares of stock, Tr. 437-39; Gov. Exh. 120. On November 15, 2015, he emailed explicit line-by-line instructions to Jeff Foley on how to fill in NTGL's financials and disclosures. Gov. Exh. 130. On March 30, 2016, he emailed Phil Foley with numbers for inclusion in a NTGL filing, Tr. 595-96, that matched the numbers used in the NTGL's Consolidated Balance Sheet for the period ending December 31, 2015. Gov. Exhs. 255 and 90. In another email, defendant made it clear to Lisa Foley that he had reviewed the NTGL payroll numbers and he instructed her to fix them. Gov. Exh. 331.

The government also introduced jail calls corroborating defendant's control of these entities. In his telephone call with Lisa Foley on January 22, 2016, defendant asked her if she knew that the stock purchase agreement between Galaxy and River North was broken up into three segments, and she responded by saying, "I honestly

16

don't know how the SPA was done. Why?" Gov. Exh. 345. Her response that she didn't know how the SPA was done—even though she signed them as Galaxy's President— is further proof that she was merely a nominee for an entity that defendant controlled.

There was little to no evidence that any of these people pushed back on defendant's instructions. In fact, in a February 11, 2016 phone call, Lisa Foley ended a disagreement with defendant about paying employees by telling him that at the end of the day she would do what he wanted her to do. Gov. Exh. 366.

Based on this evidence, the jury rationally concluded that defendant controlled HVEL, NTEK, NTGL, and Galaxy, and that by virtue of his control of those entities, he falsely represented to Robert Laskowski that he wasn't an affiliate of HVEL in connection with HVEL's issuance of 1.1 million freely trading shares to him and his sale of them to River North, and that he caused Jeff and Lisa Foley falsely to represent to Mr. Laskowski that Galaxy wasn't an affiliate of NTGL in connection with NTGL's issuance of 18 million shares of NTGL to Galaxy and Galaxy's transfer of them to River North.

Based on the information he received, Laskowski issued a Rule 144 opinion letter stating that the 18 million NTGL shares were transferrable without a restrictive legend. Gov. Exh. 17; Tr. 719-21, 723-25, 729-45. After receiving the Rule 144 letter, Alpine Securities asked for additional information about the consulting agreement between Cetek and Maidenbaum, since that agreement was the

17

antecedent debt that formed the basis for defendant's claim that Galaxy had acquired the shares in 2013. Gov. Exh. 30; Tr. 745-46. Alpine wanted to ensure that, among other things, the debt was legitimate and that Maidenbaum had actually performed work pursuant to the agreement. *Id.* Laskowski followed up by contacting Maidenbaum, who perpetuated defendant's lies by telling Laskowski that he had performed marketing and social media services and that "the promissory note was received." Gov. Exh. 409; Tr. 746-48. Based on that false response, Laskowski wrote a letter to Alpine Securities representing that Maidenbaum had performed the services for Cetek and had received a promissory note in payment for those services. Gov. Exh. 23; Tr. 753-55.

Jersey Stock Transfer then permitted the 18 million shares to be transferred from Galaxy to River North, and Alpine Securities then permitted River North to deposit 6 million of those shares into its brokerage account and permitted Dorado Investments (River North's sister company) to deposit 12 million of those shares into its brokerage account. Tr. 939-46. Because David Foley had fraudulently caused the shares to be unrestricted by lying about his control of these entities, River North and Dorado Investments were able to start selling those shares in the public market (OTC Market) right away. In return, Galaxy received approximately $182,000 from River North. Gov. Exhs. 84, 85.

18

## 2.    The Pump and Dump

But the evidence at trial showed that defendant's fraud did not end with the fraudulent unrestricting of the shares. He also executed a pump and dump to ensure he could sell the shares at the highest possible price.

The three stock purchase agreements between Galaxy and River North provided that River North would pay Galaxy for the 18 million NTGL shares at a price discounted from the prevailing market price. Gov. Exhs. 19, 20, 22. Therefore, it was in defendant's interest to boost the price of NTGL shares at around the time of the closing to increase the amount of money River North would pay to Galaxy (and thereby to him). As Greg Share testified to, Tr. 952-53, and emails showed, defendant also needed to create a certain amount of trading volume for River North to buy the shares. Emails between defendant and Michael Chavez showed that defendant knew trading volume was important to River North. Gov. Exhs. 105, 111, 122.

In order to boost the price of NTGL's stock price, defendant coordinated with co-defendant Bennie Blankenship to buy NTGL shares in order artificially to raise their price. Tr. 1066, 1069. Blankenship testified that he and defendant had an agreement that Blankenship would himself and with others purchase NTGL shares in order to increase its price. Tr. 1057-59, 1061, 1063-64.

There was overwhelming evidence that defendant was coordinating the NTGL buying with Blankenship. In addition to Blankenship's unequivocal testimony about how they agreed that Blankenship would help push the price of NTGL higher through

19

buying shares ("support", as they called it), he testified about how defendant agreed to pay him for doing it. Tr. 1064-65. Emails corroborated their agreement that defendant would pay him for his purchases, including in which defendant wrote that he would "match" Blankenship in an amount based on how high NTGL's price went. Gov. Exhs. 140, 174. Blankenship's emails confirmed that he was expecting defendant to compensate him for his work, saying, "You said when you get out so I assumed that meant I wouldn't get the stock until that time. If we can agree on how many shares and that I get them in April along with all the required documents like before I will cover this guy and put this to bed." Gov. Exh. 160. And in April 2016, Blankenship and defendant discussed in emails whether Foley could pay him $50,000 cash, or whether some would be in the form of stock. Gov. Exhs. 263, 264.

The emails show that defendant gave directions to Blankenship on how to pump the shares. For instance, in a December 12, 2015 email, he wrote to Blankenship that "slow and steady will win the race. I think a bit in the morning, a bit mid day and bit at the end, just constant will work well . . ." Gov. Exh. 147. The government introduced numerous emails between defendant and Blankenship in which they wrote to each other about Blankenship's purchases of NTGL shares and share purchases made by others whom Blankenship recruited to buy shares in about the first few months of 2016. The jury heard testimony from three investors whom Blankenship convinced to purchase NTGL shares as part of defendant and his fraud,

20

albeit these investors did not know they had been recruited artificially to pump up the stock's price. Tr. 545-49, 1285-87, 1302-05.

Blankenship also sent emails to defendant apprising him of the number of shares he was purchasing and his efforts to reach and maintain certain price levels. In his emails, he frequently referenced the "support" he was giving to NTGL's stock price.

The government's summary witness testified that several of Blankenship's texts to defendant apprising him of how many NTGL shares Blankenship and the people he recruited had purchased were corroborated by her analysis of trade blotter information in relation to emails. Gov. Exh. 403; Tr. 1475, 1479-83. For example, on January 11, 2016, two of the investors Blankenship recruited purchased 447,746 NTGL shares at prices ranging from $0.03 to $0.042, between approximately 9:30 a.m. and 10:10 a.m.; and at approximately 10:12 a.m., Blankenship emailed defendant that, "My crew has bought 450K so far. Just broke .04." . . . In other words, Blankenship was doing exactly what defendant wanted him to do and he was communicating to defendant the results of their efforts. And the summary charts also showed the correlation between the trading volume and the price of NTGL's shares during January 2016, when Blankenship and his recruits purchased NTGL shares. Tr. 1466-67, 1471-74. The charts also showed the drop in NTGL's shares price beginning in about early February—the "dump" caused by the people selling the shares that had been artificially boosted. Tr. 1468.

21

While defendant suggests that Blankenship was doing this on his own and that he lied to defendant about what he was doing, the evidence showed that while Blankenship sometimes exaggerated his capabilities to defendant and sometimes sold NTGL shares rather than bought them, his overall efforts to pump NTGL's share price was precisely what defendant wanted him to do. Their efforts were quite successful in accomplishing the goal of artificially raising the stock price and manufacturing trading volume. Defendant's argument that Blankenship was doing this on his own is also belied by his own emails with and about his wife, Lisa Foley, as well as with others. For instance, defendant emailed with Lisa Foley asking whether Michael's guy can bring in "buying support on ntgl for 2 weeks? needs about 200k shares a day purchased. if he can do that I have another guy that can also do 400k more shares a day, together it would be very helpful and worth the money." Gov. Exh. 151. "Another guy" was a reference to Bennie Blankenship.

Blankenship's testimony corroborated that defendant and Blankenship discussed whether Lisa Foley was able to get others to assist in buying NTGL shares, and often discussed the desire to get others to assist in buying NTGL shares to support its price. Tr. 1063-64, 1079. Defendant emailed Michael Chavez that "we also plan on ramping up ntgl starting next week to bring it up into good daily volume and blasting past the .033 range pretty quickly as it has no sellers in this range which is a great thing." Gov. Exh. 129. The evidence showed that Blankenship's work was all

part of defendant's broader efforts to artificially raise NTGL's stock price and manufacture trading volume as part of a pump and dump.

A rational jury could have concluded—and here did conclude—that David Foley worked with Bennie Blankenship and others to artificially raise the price of the NTGL shares that Foley fraudulently had caused to be unrestricted, thereby defrauding the investing public and breaking the two securities fraud laws he was charged with violating.

### B.  The Motion for a New Trial Should be Denied

Defendant has raised no issue that warrants the grant of a new trial, and some of his arguments already were rejected by this Court.

### 1.  The Jury Instructions Were Correct

Defendant argues that the Court erred in not instructing the jury that it must be unanimous in how the securities fraud charges were violated. To the contrary, the Court properly instructed the jury on the elements of the two securities fraud charges and properly did not require the jury that it need to reach unanimity on the means of violating the first element of the offenses.

This Court properly instructed the jury that for each of the two securities fraud counts, the defendant had to have acted willfully, and had to have knowingly used or caused to be used instrumentalities of interstate commerce. This Court also instructed the jury that as to the fraudulent conduct charged in Count Nine (the 1934 Act), there were three means by which the defendant could have engaged in fraud: (1) employed a device, scheme, or artifice with the intent to defraud; (2) made untrue

23

statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) engaged in acts, practices, or courses of business which operated and would operate as a fraud or deceit upon any person. As to Count 10 (the 1933 Act), the second possible means of committing the fraud was to obtain money or property by means of any untrue statements of material facts or any omission to state materials facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. For each count, there is no dispute between the parties that all three means did not have to be established for the element to have been met. While they were charged in the conjunctive, they could be proved in the disjunctive.

Contrary to defendant's argument, the Seventh Circuit has consistently held that the means used to carry out a fraudulent scheme are not separate elements requiring unanimity. *United States v. Boliaux*, 915 F.3d 493, 495 (7th Cir. 2019), *citing Richardson v. United States*, 526 U.S. 813, 817 (1999*). See also Hernandez v. United States*, 2022 WL 1316587, at \*3 (May 3, 2022) (Kendall, J.). In *United States v. Yeaman*, 194 F.3d 442 (3rd Cir. 1999), the Third Circuit applied this same reasoning to the application of the fraud element of Section 17(a) (the 1933 Act). There, the Court held that the three ways of committing fraud in the offer or sale of a security under Section 17(a) were "largely overlapping categories and all fall within the traditional understanding of the concept of fraud." *Id.* at 453. Differentiating

24

Section 17(a) from the Continuing Criminal Enterprise statute, which criminalized engaging in a continuing series of violations of a broad range of criminal statutes, the Third Circuit held that Section 17(a) did not cover many different forms of behavior of varying degrees of seriousness, and instead is limited to fraud in the offer and sale of securities. *Id.*, at 454. *But see*, *United States v. Weiner*, 578 F.2d 757, 788 (9th Cir. 1978). Defendant's argument that the complexity of the case made jury confusion likely is without support. His argument that the verdict suggests the jury likely had different positions on what the government proved is without support and illogical. The jury convicted defendant on both securities fraud counts—which contained the means language. There is no indication the jury did not understand the means instruction or was divided on that point. The instruction was a clear and accurate statement of the law.

This Court considered these cases as part of the jury instruction conference and correctly concluded that the *Yeaman* case accurately represents the law on a unanimity instruction concerning these securities fraud charges.

### 2.    Coconspirator Statements Were Properly Admitted

The Court also properly admitted certain testimony as coconspirator statements. Nothing about the outcome of the trial changes the correctness of that ruling.

Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." In this Circuit, the

25

preferred way for the government to make its preliminary factual showing as to the admissibility of coconspirator statements is by filing a pretrial *Santiago* proffer of the government's evidence in support thereof. *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978). *See also United States v. Rodriguez*, 975 F.2d 404, 406 (7th Cir. 1992); *United States v. Boucher*, 796 F.2d 972, 974 (7th Cir. 1986).

The standard to be applied by the district court in the context of admissibility under Rule 801(d)(2)(E) is the preponderance of the evidence standard. *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996)(*citing United States v. Bourjaily*, 483 U.S. 171, 175-76 (1987)). In making this determination, the judge must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made. . ." *Id*. at 1143 (citation omitted); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If the Court determines the statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

Here, this Court considered the government's proffer and defendant's written objection and conditionally admitted the co-conspirator statements. The Court determined that the proffered evidence established the prerequisites for admission by a preponderance of the evidence. Subsequently, at trial, the government introduced the evidence that it had proffered in its *Santiago* filing. Nothing about the evidence presented at trial undermined the Court's conditional admission of the co-conspirator statements. The government therefore met its burden to establish the

26

bases for the admission of the co-conspirator statements. As a result, the jury properly considered those statements in reaching its verdict.

Defendant's arguments fail for several reasons. First, defendant has waived his objection to the admissibility of the co-conspirator statements. The proper procedure is for the defendant, at the close of the government's case, to move to strike the co-conspirator statements or move for a mistrial if he believes the government's evidence at trial failed to establish admissibility by a preponderance. *See United States v. Haynie*, 179 F.3d 1048, 1050-51 (7th Cir. 1999). The government's recollection is that defendant did not raise such an objection at the close of the government's case. If true, then defendant waived his objection to the admission of the statements and the jury's consideration of those statements. *See id.* To raise the issue now, for the first time, is unfairly prejudicial to the government, which could have altered its trial strategy, including in a rebuttal case or its closing argument, if defendant's objection at trial had been raised appropriately and sustained.

Second, the government's evidence at trial was consistent with its pretrial proffer. Defendant is seeking in essence for this Court to reconsider its initial ruling admitting the statements. *See United States v. Rollins*, 607 F.3d 500, 502 (7th Cir. 2010) (noting motions to reconsider are available in federal criminal cases). Putting aside that it appears defendant waived his objection and such a reconsideration motion would be untimely, defendant has failed to identify any errors in the Court's original ruling or intervening change in the law that warrant reconsideration. *See*

27

*id.* at 502 (noting reconsideration motions should be treated just like such motions in civil cases); Fed. R. Civ. P. 60(b) (authorizing reconsideration motions to correct errors or due to intervening changes); *Provident Savings Bank v. Popovich*, 71 F.3d 696, 698 (7th Cir. 1995) (explaining reconsideration "is to be granted only in exceptional circumstances"); *Musch v. Domtar Industries, Inc.*, 587 F.3d 857, 861 (7th Cir. 2009) (noting reconsideration motions are not the appropriate vehicle to rehash previously rejected arguments).

Defendant's argument also fails on the merits. Defendant argues that the government failed to prove that there was a conspiracy (or, here, a scheme), because, he says, defendant did not conspire or scheme with Bennie Blankenship. To the contrary, as explained above in the government's response to defendant's Rule 29 motion, the evidence showed convincingly that defendant and Bennie Blankenship schemed together artificially to pump the price of NTGL shares through coordinated buying. Blankenship himself testified as much, and the government introduced dozens of emails proving the scheme. The evidence confirmed what the government said it would prove in its *Santiago* proffer.

Defendant's argument that the jury's verdict constituted a judgment that defendant did not scheme with anyone is wrong. While the jury acquitted defendant of the wire fraud counts, it convicted him of the securities fraud counts, including Count Nine, which alleged the purchase and sale of securities. The evidence admitted based on the Court's pretrial ruling was properly considered by the jury, and there is

28

nothing about the evidence or the jury's verdict that undermines the Court's pretrial admission of coconspirator statements.

Defendant cannot bootstrap the jury's verdict to the question of admissibility. The question of admissibility is separate from the question of guilt, and the Court makes final determinations of admissibility before the jury ever receives the case. *See Santiago*, 582 F.2d at 1133 (explaining that the admissibility question "now rests solely upon the trial judge. There is no further appeal from that ruling on admissibility by the defendant to the jury."). Under the evidentiary rules, including Rule 104(a), there is no basis to reconsider an admissibility ruling based on a jury's subsequent decision. *See id*. at 1134 (noting the judge's admissibility decision was "conclusive").

Even putting aside this improper bootstrapping, no inference can be drawn from the jury's acquittal on the wire fraud counts. The jury's application of the higher proof beyond a reasonable doubt standard makes it impossible to draw an inference about whether the government met the preponderance standard for admissibility. The jury very well could have concluded that the government proved the wire fraud scheme by a preponderance, which then would support the Court's admissibility decision. Consequently, this Court should consider those properly admitted statements in determining whether the jury's guilty verdict on the substantive counts, where it was entitled to consider those statements, was rational.

29

### 3.    Counts Nine and Ten Were Not Multiplicitous

The parties already have argued at length about whether Counts Nine and Ten are multiplicitous. (Dkt Nos. 49, 58, 59, 155) The government stands by its arguments that the two statutes are sufficiently distinct in their elements that they are not multiplicitous, and that removing the "or sale" language from Count Ten in the Amended Indictment further eliminates any argument that the counts are multiplicitous, as Count Nine charges fraud in the purchase and sale of a security, while Count Ten, as amended, charges fraud only in the offer of a security.

Defendant's argument that there effectively is no distinction between an offer and a sale is incorrect. Section 17(a) is worded in the disjunctive and clearly distinguishes between an offer and a sale. In other words, a person can violate the statute through fraud in the offer of a security as opposed to in the sale of a security.

Here, the evidence is beyond dispute that defendant wanted to sell shares of HVEL and NTGL to River North, so he committed fraud to sweeten the offer. His communications with Michael Chavez, and the communications of others on his behalf with Laskowski, Chavez and representatives of River North regarding the offer to sell shares, showed that defendant wanted River North to purchase the HVEL shares from him and to purchase the NTGL shares from Galaxy. Defendant knew that River North was not interested in purchasing restricted shares of either company because that would have necessitated a one-year waiting period for River North before it could sell the shares. The stock purchase agreements provided for River

30

North's purchase of the shares at a discount from the market price so River North could sell the shares quickly to take advantage of the discounted price. To make the offer to River North attractive, defendant committed fraud by causing the shares to be unrestricted when they should have been restricted. In that way, defendant committed fraud in the offer of those shares.

Defendant's argument that the only evidence of an offer was a September 29, 2015 email from defendant to Michael Chavez in Gov. Exh. 105 is incorrect. First, there are other emails concerning the terms of the proposed sale, including Gov. Exh. 107, in which defendant emailed Chavez on October 1, 2015, that he would not accept a 50% discount, and Gov. Exhs. 110 through 113, in which defendant and Chavez emailed each other on October 5-7, 2015, negotiating the terms of the sale of NTGL shares to River North, including their disagreements about acceptable prices for acceptable discounts. On October 22, 2015, Gov. Exh. 122, and October 28, 2015, Gov. Exh. 123, defendant emailed Michael Chavez and Lisa Foley, respectively, writing that NTGL "is about to take off" with volume growth the next week and telling Chavez that what River North was willing to pay wasn't enough, Gov. Exh. 122. He instructed Lisa Foley to let Chavez know, among other things with respect to NTGL shares, how much of an advance Lisa Foley should say she needed for the shares. Gov. Exh. 123. These negotiations were part of defendant's offer of shares to River North.

As discussed above, Greg Share testified that River North wanted only unrestricted shares. Tr. 955. So, defendant's fraudulent efforts to get these shares unrestricted by lying to Mr. Laskowski and having others lie to him on his behalf were all part of presenting to River North an offer for shares that was based on fraud.

Even if the Court were to conclude that the securities fraud counts were multiplicitous—and the government maintains they were not—the remedy would not be to dismiss the two counts. Rather, the remedy would be to vacate the multiplicitous count, *United States v. Chilaca*, 909 F.3d 289, 296-97 (9th Cir. 2018), or to merge the counts and give a sentence based on that merger, *see United States v. Platter,* 514 F.3d 782, 786-787 (8th Cir. 2008)(". . . the proper remedy when a defendant is convicted of multiplicitous counts is merger of the counts into one count, not a retrial under just one theory of liability."); *United States v. York*, 59 F.3d 172, at *2-4 (6th Cir. 1995)(unpublished); *United States v. Ray*, 2020 WL 1472136 (N.D. Ind. 2020). *See also United States v. Parker*, 508 F.3d 434, 439-441 (7th Cir. 2007)(improper to sentence defendant on multiplicitous counts even if sentences were concurrent, where the concurrent sentence carried just an additional $100 special assessment).

### 4. The Jury's Verdict Was Not Irreconcilable and Was Not Against the Manifest Weight of the Evidence

Defendant next claims that the jury's acquittal on the wire fraud counts is inconsistent with its guilty verdict on the securities fraud counts. But this argument ignores contrary law on inconsistent verdicts, ignores the instructions the jury was provided here, and ignores the abundant evidence proving both securities and wire

32

fraud, and the multiple theories under which the jury could have returned a securities fraud guilty verdict and a wire fraud acquittal.

There is no legal basis for the Court to overturn defendant's conviction on the grounds that his conviction on the securities fraud count is supposedly inconsistent with his acquittal on the wire fraud charges. While the evidence underlying the two sets of counts is similar, the elements of the two charges are distinct and the jury may have found that the government did not prove one of the distinct elements in the wire fraud counts. *See United States v. Gross*, 961 F.2d 1097, 1106-07 (3rd Cir. 2012) (in deciding whether acquittal for filing false statement with SEC was inconsistent with conviction of insider trading and mail fraud counts, appellate court noted that the jury might not have found that an element was proved with respect to the false statement count, thereby meaning that the verdicts were not inconsistent).

For instance, it may well be that the jury concluded that none of the specific executions set forth in the wire fraud counts were in furtherance of the charged wire fraud scheme. The securities fraud counts, by contrast, charged the violations as a whole, without alleging particular executions in furtherance of those violations. The jury could have found that the government proved the securities fraud violations as a whole (and thus proved securities fraud), but failed to prove the specific wire fraud executions that were in furtherance of the charged wire fraud scheme. Additionally, it may be that the jury acquitted on the wire fraud counts because it did not believe that taking money or property was the defendant's intent, while still believing—with

33

respect to the securities fraud charges—that other means of committing the fraud, besides taking money or property, were present and intended for purposes of the securities fraud charge in Count Ten (Count Nine does not list obtaining money or property as one of the means of committing the fraud). It also may be that the jury did not find that defendant was engaged in a scheme, in which case they would have had to acquit on the wire fraud counts, while it was not necessary to prove a scheme for purposes of Counts Nine and Ten. In any event, one is left to speculate as to why the jury acquitted on one set of charges but convicted on others.

Even if this Court were to conclude that the jury's verdict was inconsistent, that would not justify the granting of a new trial. In *United States v. Powell*, 469 U.S. 57 (1984), the Supreme Court reaffirmed that inconsistent jury verdicts should not be disturbed. Even where a jury convicts on a compound offense and acquits on a predicate offense, the Court recognized that a jury may have arrived at an acquittal based on mistake, compromise, or lenity. *Powell*, 469 U.S. at 64-65. Even though inconsistent verdicts most certainly mean the jury has not followed the trial court's instructions, "it is unclear whose ox has been gored." *Id.* at 65. "Given this uncertainty, and the fact that the government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant a new trial on the conviction as a matter of course." *Id.* Any individualized inquiry into the actual basis for the jury's inconsistent verdict would require an inquiry into the jury's deliberations, which courts generally do not undertake. *Id.*, at 66.

34

The Seventh Circuit has followed the holding in *Powell* in rejecting arguments about inconsistent verdicts. *See United States v. Evans*, 486 F.3d 315, 322-24 (7th Cir. 2007); *United States v. Pisman*, 443 F.3d 912, 914-15 (7th Cir. 2006).[2] In *United States v. McGee*, 408 F.3d 966, 985 (7th Cir. 2005), for example, the Seventh Circuit affirmed a conviction for use of a telephone to facilitate the conspiracy even though the defendant was acquitted of the underlying conspiracy charge.

The jury here was properly instructed that it must consider each charge separately, that the number of charges is not evidence of guilt, and that its decision on one charge, whether it is guilty or not guilty, should not influence their decision on any other charge. R. 215, at 36. It appears the jury followed the instruction it was given and did consider each charge separately. Even if the jury reached a compromise verdict by acquitting on some charges and convicting on other charges, as defendant suggests, that is its prerogative.

As explained above, the evidence supporting defendant's conviction of the securities fraud counts was more than sufficient for a rational jury to have made that decision (Rule 29). Neither was its decision against the manifest weight of the evidence (Rule 33). The mixed verdict as to the two types of charges do not create a basis to order a new trial.

---

[2] In *Pisman*, the Seventh Circuit noted that *Powell* does not apply where two guilty verdicts cannot co-exist, *Pisman*, 443 F.3d at 914 (citing *Powell*, 469 U.S. at 68-69, n.8), a situation that does not apply here. That situation is the opposite: where a guilty verdict on one count logically excludes a finding of guilt on the other.

WHEREFORE, the government respectfully asks this Court to deny defendant David Foley's motions for judgment of acquittal and for a new trial.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By:  /s/ *Matthew M. Getter*
MATTHEW M. GETTER
ELIE ZENNER
Assistant U.S. Attorney
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 886-7651
(312) 697-4032

Dated: June 18, 2025

36